## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN-KYU KIM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 17 C 1300 |
| v. | ) | |
| | ) | |
| THE KOREAN NEWS OF CHICAGO, INC., | ) | Judge Thomas M. Durkin |
| ANDREW HUH, SOOK Y. KIM, and | ) | |
| ROBERT B. KIM, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

In-Kyu Kim ("Plaintiff") brings this action against The Korean News of Chicago, Inc. ("KNCI"), Andrew Huh, and husband and wife Sook K. Kim ("Mrs. Kim") and Robert B. Kim ("Mr. Kim") under the Fair Labor Standards Act ("FLSA") and Illinois Minimum Wage Law ("IMWL") for minimum wage and overtime pay during his employment as KNCI's president. Plaintiff also sued for breach of an alleged oral agreement to make him a 30% shareholder in KNCI. Each defendant moved for summary judgment, and Plaintiff cross-moved for partial summary judgment on his FLSA and IMWL claims. R. 82; R. 85; R. 88; R. 91; R. 99. For the following reasons, Mrs. Kim's motion is granted in its entirety, each remaining Defendants' motion is granted in part and denied in part, and Plaintiff's motion is granted in part and denied in part.

## Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Local Rule 56.1

Local Rule 56.1 requires parties moving for summary judgment to submit in support of their motion a statement of material facts comprised of short numbered paragraphs with citations to admissible evidence. L.R. 56.1(a). It requires the nonmovant to then respond particularly to each such numbered paragraph, and, in the case of disagreement, provide citations to supporting evidentiary material. L.R. 56.1(b). When a nonmovant fails to controvert those facts in the manner proscribed, they are deemed admitted. *Id.*; *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Here, Plaintiff failed to respond to Defendants' Local Rule 56.1 statements. The

assertions in each are supported by evidentiary material, so the Court credits Defendants' uncontroverted version of the facts to the extent not disputed by Plaintiff's own Local Rule 56.1 statement and evidentiary material. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012) (citing *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005)).

Further, although Plaintiff submitted an "appendix" in response to Defendants' motions that purports to include additional evidence, because Plaintiff failed to respond to Defendants' Rule 56.1 statements (and failed to submit a statement of additional facts of his own), Plaintiff's "appendix" is not properly before the Court. *See* L.R. 56.1(b)(3)(C) (a party opposing summary judgment shall submit "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment"). Accordingly, the Court will not consider its contents. Even so, Defendants still must demonstrate that they are entitled to judgment as a matter of law, and the Court still draws all reasonable inferences in Plaintiff's favor in considering Defendants' motions. *Keeton*, 667 F.3d at 884; *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 543 (7th Cir. 2011). With this in mind, the Court turns to those facts set forth in and supported by the parties' submissions in accordance with Local Rule 56.1.

## Background

This case concerns compensation allegedly owed to Plaintiff in connection with the acquisition and operation of the Korea Times Chicago newspaper (the "Newspaper") by KNCI. Plaintiff met Robert Kim in or about 2008, when Plaintiff

was president of the Newspaper. R. 89 ¶ 4. At that time, the Newspaper was owned by The Korea Times Chicago, Inc. *Id.* Plaintiff left the Newspaper in 2010, but when he learned that it was for sale in Spring 2014, he notified Mr. Kim to see if he would buy it. *Id.* ¶ 6. Initially, Mr. Kim declined because he did not have experience in the newspaper business. *Id.* ¶ 7. But Plaintiff approached Mr. Kim again a short time later, telling him that if he invested in the Newspaper and Plaintiff became president, he could generate profits as he had for its previous owners. *Id.* On July 14, 2014, Huh and Mr. Kim's wife, Mrs. Kim, formed KNCI as 50% shareholders and directors in order to purchase the Newspaper. R. 89, Ex. B ¶ 7; R. 83 ¶ 9; R. 100 ¶ 3; R. 110 ¶ 3. Although KNCI did not yet own the Newspaper, Mrs. Kim and Huh appointed Plaintiff president and Huh publisher that same day, and took certain additional steps concerning the Newspaper's operation prior to the consummation of the sale. R. 100 ¶¶ 3, 7; R. 110 ¶ 7. Plaintiff, who was working for another company in New York at the time, claims that he too began working between 8 and 10 hours per week "performing phone calls and other tasks . . . for the benefit of [KNCI] as it worked to purchase [the Newspaper]." R. 100 ¶ 8 (citing R. 102, Ex. A ¶ 5). Plaintiff was not paid for this work, R. 100 ¶ 9; R. 110 ¶ 9, but sometime between July 14, 2014 and the Newspaper's purchase, Plaintiff and Mr. Kim discussed Plaintiff's compensation (among other things), R. 89, Ex. B ¶ 9. There is no dispute that beginning after KNCI purchased the Newspaper, Plaintiff was paid a salary. But while the parties acknowledge a pre-acquisition agreement for additional compensation once KNCI purchased the Newspaper, they dispute what was promised. That is, Mr. Kim

4

contends that the agreement was that Plaintiff would receive 30% of KNCI's net profits, R. 89, Ex. B ¶ 9, whereas Plaintiff contends he was to become a 30% shareholder in KNCI, R. 107, Ex. A ¶ 23. KNCI purchased the Newspaper on August 15, 2014. *Id.* ¶ 8. Plaintiff moved from New York to Chicago that same day, and began operating the Newspaper thereafter. R. 92 ¶¶ 5, 7. Approximately one month later, Mrs. Kim, who had served as corporate secretary, transferred her shares in KNCI to Mr. Kim. R. 83 ¶ 9. Thereafter, she had no ownership interest in KNCI and was no longer an officer or director. *Id.* ¶¶ 9-10.

As KNCI's president, Plaintiff was responsible for KNCI's revenue growth, managing and supervising its employees and directing its overall business operations. R. 92 ¶¶ 7, 11. Plaintiff also was head of KNCI's editing and publication department. *Id.* ¶ 7. From August 16, 2014 through January 31, 2015, Plaintiff was paid $2000 per month in semi-monthly installments of $1000 regardless of the number of hours he worked. R. 100 ¶ 12; R. 110 ¶ 12. According to Plaintiff, beginning August 16, 2014, he spent 75 to 100 hours per week performing his duties.[1]

Effective February 4, 2015, KNCI terminated Plaintiff's employment through its directors, Huh and Mr. Kim. R. 110 ¶ 5. Plaintiff was not paid his salary for his last week of employment (February 1 through February 4, 2015). But he obtained $500 in gas cards for personal use with a KNCI credit card. R. 110, Ex. B2 ¶ 4.

---

[1] Plaintiff testified at his deposition that he worked 75 hours per week, R. 110, Ex. A at 55, but in his declaration estimated that he worked 100 hours per week, R. 102, Ex. A ¶ 8.

Plaintiff has not received any share in KNCI's profits and was not made a shareholder.

Plaintiff filed a five-count complaint against Defendants alleging: Defendants failed to pay him overtime wages in violation of the FLSA (Count I) and IMWL (Count IV); Defendants failed to pay him minimum wage in violation of the FLSA (Count II) and IMWL (Count III); and Defendants breached an oral contract to make him a shareholder in KNCI (Count V). R. 1. Each Defendant moved for summary judgment on Plaintiff's FLSA and IMWL claims, and the individual defendants also moved for summary judgment on Plaintiff's breach of contract claim. Plaintiff cross-moved for summary judgment on his FLSA and IMWL claims.

Analysis

## I.     FLSA and IMWL Claims as to All Defendants

The parties' cross motions each seek summary judgment on Plaintiff's overtime and minimum wage claims under the FLSA and IMWL. The parties' arguments turn in part on whether Plaintiff is subject to any exemption, and in part on whether Defendants can be considered "employers" within the meaning of the FLSA and IMWL. Defendants also argue that Plaintiff was not protected by either the FLSA or the IMWL before KNCI purchased the Newspaper and he assumed his duties as president. The Court addresses each issue below, beginning with the last.

### A.     Whether Plaintiff was covered by the FLSA or IMWL during the pre-acquisition period

*FLSA.* Defendants argue that Plaintiff was not covered by the FLSA before KNCI purchased the Newspaper (the "pre-acquisition period") and therefore was not

6

subject to its protections during that time. A plaintiff is protected by the FLSA if either the employer is a covered enterprise or the plaintiff is a covered individual. *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 790 (N.D. Ill. 2010) (citing *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 n.8 (1985)). It is plaintiff's burden to prove that at least one is true. *Kim v. Ctr. for Seniors*, 2019 WL 5183848, at *2 (N.D. Ill. Oct. 15, 2019). A covered enterprise has (1) "employees engaged in commerce or the production of goods for commerce or . . . employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person;" and (2) an annual gross volume of sales made or business done of at least $500,000. 29 U.S.C. § 203(s)(1)(A)(i), (ii). If enterprise coverage exists, all of the enterprise's employees are protected by the FLSA, regardless of their personal involvement (or not) in interstate commerce. *Rivera v. Heights Landscaping, Inc.*, 2004 WL 434214, at *1 (N.D. Ill. Mar. 5, 2004). The FLSA also protects individual employees to the extent they are "engaged in commerce or in the production of goods for commerce," 29 U.S.C. § 207(a)(1), even if their employers are not covered enterprises, *Rivera*, 2004 WL 434214 at *1.

Here, although Plaintiff contends that he performed 8-10 hours of work per week on behalf of KNCI during the pre-acquisition period, there is no evidence that KNCI grossed sales or business of at least $500,000 in 2014 (the year in which KNCI was formed and purchased and began to operate the Newspaper). Nor is there evidence of any sales or business during the pre-acquisition period at all. Accordingly,

Plaintiff has failed to present any evidence from which a jury could conclude that KNCI (or any other defendant) was a covered enterprise under the FLSA.

Nor is there any evidence to suggest that Plaintiff (or anyone else) was "engaged in commerce or in the production of goods for commerce" during the pre-acquisition period. Instead, Plaintiff asserts only that he worked in furtherance of KNCI's purchase of the Newspaper. Accordingly, Plaintiff has also failed to create a genuine issue of fact that he was a covered individual during the pre-acquisition period, and Defendants' motion for summary judgment on Plaintiff's FLSA minimum wage claim for that period is granted.

**IMWL.** Defendants also argue that Plaintiff was not covered by the IMWL during the pre-acquisition period, because he was not an "employee" under the IMWL. The IMWL explicitly excludes employers with fewer than four employees. *See* 820 ILCS 105/3(d)(1)). Plaintiff fails to respond to Defendants' argument and so it is waived. But even if it weren't, and the Court considered Mrs. Kim (as one-time KNCI shareholder and corporate secretary), Huh (as KNCI shareholder and publisher) and Plaintiff (KNCI's president) to be KNCI employees during the pre-acquisition period, Plaintiff is one short of the IMWL threshold. Accordingly, Plaintiff's IMWL claim for minimum wage pay during the pre-acquisition period also fails. *See Jensen v. Longwood Towers, LLC*, 2000 WL 690180 at *2 n.2 (N.D. Ill. May 26, 2000) (noting that it is plaintiff's burden to demonstrate that his employer has the requisite number of employees for the IMWL to apply). Defendants' motion for summary judgment on Plaintiff's IMWL minimum wage claim during the pre-acquisition period is granted.

### B.    Whether and when the executive exemption applied to Plaintiff

The Court's analysis in section I(A) does not apply to the post-acquisition period, because there is no dispute that KNCI was running the Newspaper at that time and therefore that Plaintiff was "engaged in commerce." Additionally, there is no dispute that Plaintiff supervised approximately 10 employees as President of the Newspaper post-acquisition. But Defendants argue that Plaintiff's minimum wage and overtime claims for the post-acquisition period fail in any case because Plaintiff was exempt from the FLSA and IMWL. The FLSA generally requires employers to pay employees at least minimum wage, as well as overtime pay (i.e., one and one-half times the regular rate) for any hours worked in excess of 40 per week unless an exemption applies.[2] 29 U.S.C. § 213(a)(1); *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 571-72 (7th Cir 2012). It is the employer's burden to establish that an individual qualifies for one of these exemptions, which are "narrowly drawn" against the employer. *Schaefer-LaRose*, 679 F.3d at 571 (citing *Johnson v. Hix Wrecker Serv., Inc.*, 417 U.S. 188, 196-97 (7th Cir. 2011)).

Defendants argue that Plaintiff is exempt as an "employee in a bona fide executive . . . capacity." 29 U.S.C. § 213(a)(1). The FLSA regulations in effect at the

---

[2] The relevant provisions of the IMWL are substantially similar, so the Court's analysis of Plaintiff's FLSA claims applies equally to his IMWL claims. *See Callahan v. City of Chi.*, 78 F. Supp. 3d 791, 821 (N.D. Ill. 2015) ("Because the IMWL parallels the FLSA so closely, courts have generally interpreted their provisions to be coextensive, and so have generally applied the same analysis to both."); *see also* 820 ILCS 105/4a(2)(E) (incorporating the FLSA's exemption for bona fide executive employees).

9

time define such an employee as one who: (1) performs certain job duties;[3] and (2) is "[c]ompensated on a salary basis at a rate not less than $455 per week." 29 C.F.R. § 541.100(a). Determining the applicability of an overtime exemption is often a fact-intensive, individualized inquiry into the employee's duties and responsibilities. *Schaefer-LaRose*, 679 F.3d at 572. But here, there is no dispute that as president, Plaintiff met the job duty requirements set forth in 29 C.F.R. § 541.100(a)(2)-(4). *See* R. 107 at 11 (Plaintiff's brief stating that "Plaintiff does not contest . . . that he performed the duties described [by Defendants]" with no further discussion). Nor do the parties dispute that Plaintiff was paid in accordance with 29 C.F.R. 541.100(a)(1) from August 16, 2014 until January 31, 2015 (that is, Plaintiff was paid $1000 semi-monthly, or approximately $500 per week). As such, Plaintiff met the requirements for the executive exemption during that period.

But the parties debate the effect of Defendants' failure to pay Plaintiff's salary during the pre-acquisition period and his final week of employment. Plaintiff argues that Defendants "lost" the benefit of the executive exemption for the entirety of his employment because of this failure, and therefore that he is entitled to minimum wage for all hours worked, as well as overtime for hours in excess of 40 in a workweek. But because Plaintiff was not subject to the protections of the FLSA and IMWL

---

[3] Specifically, the employee's "primary duty" must be "management of the enterprise . . . or of a customarily recognized department or subdivision thereof," and the employee also must "customarily and regularly direct the work of two or more other employees" and generally have the "authority to hire or fire other employees." 29 C.F.R. § 541.100(a)(2)-(4).

10

during the pre-acquisition period, that "failure" has no bearing on the applicability (or not) of the executive exemption to the period in which he was.

On the other hand, that Plaintiff did not receive his salary during his final week of employment means that his employer(s) (discussed below) lose the benefit of the executive exemption for that week. And this is true even though it is undisputed that Plaintiff received the equivalent of his salary in gas cards for personal use. Indeed, the regulations provide that an exempt employee's salary must be paid exclusive of such benefits. *See* 29 C.F.R. § 541.606(a) (stating that an employee must earn the minimum salary requirement "exclusive of board, lodging or other facilities," and explaining that this phrase means "'free and clear' . . . of any claimed credit for non-cash items of value that an employer may provide to an employee."); *see also id.* § 541.606(b) (explaining that "other facilities" is defined as in 29 C.F.R. § 531.32, which includes gas and transportation)). That said, the regulations *do* allow an employer to use those same benefits toward its minimum wage obligations. *See* 29 U.S.C. § 203(m)(1) (defining "wage" as including "board, lodging, or other facilities"); *see also* 29 C.F.R. 531.32(a) (defining "other facilities" as including "gas furnished for the noncommercial personal use of the employee"). Because it is unclear how many hours Plaintiff worked during his final week, it is also unclear whether Plaintiff is owed additional compensation over and above the $500 received in gas cards, and if so, in what amount. So summary judgment is improper as to Plaintiff's FLSA and IMWL claims for his last week of employment.

11

Finally, the Court does not agree with Plaintiff that Defendants' failure to pay his salary during his final week destroys the exemption for the period before it. Plaintiff points to the FLSA regulations and the Department of Labor ("DOL") Field Operations Handbook ("Handbook") to support his argument. They state that: (1) an exempt employee must receive his "full salary for *any week* in which the employee performs *any work* without regard to the number of days or hours worked," 29 C.F.R. § 541.602(a)(1) (emphasis added); and (2) although "an employee may be paid the salary required during certain workweeks . . . an analysis of the compensation paid over a longer period may reveal that the employee is not actually paid on a salary basis," U.S. Dep't of Labor Field Operations Handbook § 22a03 (Nov. 29, 2010).[4] Plaintiff contends that taken together, this language indicates that an exemption is lost if an employee's full salary is not paid for any week of employment. R. 101 at 17-18. But the same Handbook provision also states that the exemptions are applied "on the basis that *each workweek constitutes a separate period of exemption*." Handbook § 22a03 (emphasis added). And there is no dispute that the value of the gas cards Plaintiff obtained met the threshold set forth in 29 C.F.R. § 541.100(a). But perhaps most compelling is the fact that Plaintiff received his salary for each of the 24 weeks before his final one in accordance with 29 C.F.R. § 541.100(a). There is little about this arrangement that "reveal[s] that [Plaintiff] was not actually paid on a salary basis" during his employment. Handbook § 22a03.

---

[4] Plaintiff erroneously attributed this language to a DOL Opinion Letter, rather than the DOL Handbook.

In sum, although payment in gas cards destroys the exemption for Plaintiff's final week of employment, it has no effect on the period prior to that, so summary judgment for Defendants is proper on Plaintiff's FLSA and IMWL claims for the period beginning August 16, 2014 and ending January 31, 2015. But because an issue of fact remains regarding whether Plaintiff was adequately compensated for his final week of employment, the parties' cross motions are denied on that issue for that period to the extent any Defendant is an "employer" (discussed below).

### C.    Whether the individual defendants are liable as "employers"[5]

Even if Plaintiff is owed minimum wage and/or overtime pay for his final week of employment, only those entities or individuals that constitute "employers" within the meaning of the FLSA and IMWL can be liable.

"[C]ourts employ the same test under both [the FLSA and IMWL] to determine a defendant's status as an employer." *Natal v. Medistar, Inc.*, 221 F. Supp. 3d 999, 1003 (N.D. Ill. 2016) (citing *Condo v. Sysco Corp.*, 1 F.3d 559, 601 n.3 (7th Cir. 1993)). Whether a person or entity is an "employer" for these purposes is a question of law. *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 784-85 (N.D. Ill. 2011). "The FLSA contemplates several simultaneous employers who may be responsible for compliance with the FLSA," as determined by the "totality of circumstances, underscoring the economic reality of the employment relationship." *Id.* at 784 (internal citation omitted). Whether an individual is liable as an employer "depends not upon whether

---

[5] KNCI also argues that it was not Plaintiff's "employer" during the pre-acquisition period. But because the Court has already determined that Plaintiff was not covered by the FLSA or IMWL during that time, the Court need not address the issue here.

the individual controlled every aspect of the employees' conduct, but upon whether the individual had control over the alleged violation." *Id.* (citation omitted). Here, as the Court previously explained to the parties, the conduct comprising the alleged violation is the failure to pay Plaintiff minimum and overtime wages. *Kim v. The Korean News of Chi., Inc.*, 2017 WL 3034671, *3 (N.D. Ill. Jul. 18, 2017). Accordingly, the Court scrutinizes each Defendants' role (if any) in determining Plaintiff's compensation.

**Mrs. Kim.** There is no evidence from which a reasonable jury could conclude that Mrs. Kim was Plaintiff's "employer." Indeed, although Mrs. Kim served as a KNCI director and shareholder, she did so for two months only—the month prior to the purchase of the Newspaper, and the first month after its purchase. As discussed, Plaintiff was not covered by the FLSA or IMWL during that first month, and was paid appropriately during the second as a salaried, exempt employee. Moreover, there is no evidence from which a reasonable juror could conclude that Mrs. Kim did anything other than appoint Plaintiff president in her capacity as board member. This is not enough. *See Cardenas v. Grozdic*, 67 F. Supp. 3d 917, 923 (N.D. Ill. 2014) (noting that "the mere facts of stock ownership or officer status in an entity that employed the complaining employee [are not] enough to deem an individual an employer") (quoting *Alvarez v. Downtown Food Enters, Inc.*, 2010 WL 5158122, at *2 (N.D. Ill. Dec. 13, 2010)). Accordingly, summary judgment is proper for Mrs. Kim on Plaintiff's FLSA and IMWL claims.

14

*Huh.* Whether Huh was Plaintiff's "employer" is a closer call. In his opening brief, Plaintiff argues that he was, citing his own declaration and stating that Huh and Mr. Kim "exercised sole control over the activities of Defendant Korean News" between July 14, 2014 and February 4, 2015, and that Huh (and Mr. Kim) "managed, supervised, established and administered the terms and conditions of Plaintiff's employment," including by "participat[ing] in and approv[ing] of . . . how much and the manner in which Plaintiff was paid." R. 101 at 10. Plaintiff also states that both Huh and Mr. Kim "assigned tasks" to him; set his work schedule; and "had the power to hire and fire employees, including Plaintiff." *Id.* at 10-11. But Plaintiff's declaration directly contradicts his deposition testimony regarding whether Huh had authority to supervise or manage Plaintiff's work product or set his work hours. *See* R. 86, Ex. A at 109-110 (Plaintiff's deposition testimony indicating that when asked whether Huh had authority over his work product, Plaintiff stated "I wouldn't say that," and when asked whether Huh set his work hours or supervised his work, Plaintiff stated "he did not."). Generally, "[a] plaintiff's statements submitted by affidavit or by declaration which contradict the plaintiff's prior deposition testimony can be excluded as a sham designed to thwart the purposes of summary judgment." *Delgado v. Roadco Transp. Servs., Inc.*, 159 F. Supp. 3d 865, 868 (N.D. Ill. 2016) (quoting *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015)). Plaintiff offers no explanation for the shift. Accordingly, his declaration carries no weight to the extent to the extent contradicted. *Beckel v. Wal–Mart Associates, Inc.,* 301 F.3d 621, 623 (7th Cir. 2002) (affidavits "offered to contradict the affiant's deposition are so lacking in credibility

as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy"). Moreover, Plaintiff failed to properly respond to Huh's Local Rule 56.1 statement, which, citing Huh's affidavit (and Plaintiff's deposition testimony) indicates that Huh: was neither Plaintiff's manager nor supervisor; did not have authority over the work product Plaintiff oversaw; and did not set Plaintiff's work hours. *See* R. 86 ¶¶ 12, 14-17 (citing R. 86, Ex. A (transcript from Plaintiff's deposition) and R. 86, Ex. B (Huh's affidavit)). In fact, according to Huh, he did not even communicate with Plaintiff prior to August 15, 2014, when KNCI purchased the Newspaper. *Id.* ¶¶ 5-6. But because a genuine dispute of fact remains regarding whether Huh set or controlled Plaintiff's compensation in any way at any time (a claim made in Plaintiff's declaration and not contradicted by his deposition testimony), the Court denies the parties' cross motions as to Huh.

**Mr. Kim.** Finally, Mr. Kim argues that he cannot be an "employer" within the meaning of the FLSA and IMWL because it was Plaintiff, not he, who controlled KNCI's day-to-day operations in his role as president (while he was merely a shareholder and investor, with no experience operating a newspaper). R. 90 at 10-11; R. 109 at 9-10; R. 112 at 6-7. Mr. Kim adds that he neither set Plaintiff's work hours or schedule, nor supervised his work. R. 90 at 10. But Plaintiff asserts that as was true for Huh, Mr. Kim "managed, supervised, established and administered the terms and conditions of Plaintiff's employment," including "how much and the manner in which Plaintiff was paid," and his work schedule. R. 101 at 10-11. Both Mr. Kim and

16

Plaintiff cite largely their own declaration (Plaintiff) and affidavit (Mr. Kim) in support. This time, Plaintiff's deposition testimony does not contradict his affidavit. Further, Mr. Kim admits that he set Plaintiff's compensation. R. 89 ¶ 22. Accordingly, Mr. Kim is an "employer" within the meaning of the FLSA and IMWL.

In sum, summary judgment is granted for Mrs. Kim on Plaintiff's FLSA and IMWL claims, and summary judgment is granted for Plaintiff on the issue of whether Mr. Kim was his "employer." Genuine issues of fact remain as to whether Huh was Plaintiff's "employer," so the parties' cross motions on Plaintiff's minimum wage and overtime claims are denied as to him. Finally, because KNCI does not dispute that it was Plaintiff's employer during his final week of employment—the only week at issue—Plaintiff's claim against KNCI also will proceed.

## II. Breach of Contract Claim as to the Individual Defendants[6]

The individual defendants seek summary judgment on Plaintiff's breach of contract claim on the basis that Plaintiff cannot demonstrate the existence of an oral contract with any of them—for 30% of the shares in the Newspaper or otherwise.

To demonstrate breach of contract in Illinois, a plaintiff must establish: (1) an offer and acceptance; (2) consideration; (3) definite and certain terms; (4) plaintiff's performance of all required contractual conditions; (5) breach; and (6) damages. *Assoc. Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007) (citing

---

[6] In its reply brief, KNCI asserts that it is entitled to summary judgment on the breach of contract claim against it because Plaintiff failed to respond to its motion on that claim. But KNCI's opening brief did not seek summary judgment on that claim, so the Court declines to grant it. *See generally* R. 93.

*MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 845 N.E.2d 22, 30 (Ill. App. Ct. 2006)). Here, the parties debate whether Plaintiff has presented evidence of "definite and certain terms" sufficient to survive the individual defendants' motions.

The "definite and certain terms requirement serves several important purposes, chief among them to ensure that the parties in fact have reached an agreement and to provide courts with a basis for enforcing the obligations that the parties sought to impose upon one another." *Id.* (citing Restatement (Second) of Contracts § 33 & cmt. (a)-(b)). Illinois law precludes the Court from supplying material terms of an alleged agreement. *See Citadel Group Ltd. v. Washington Regional Med. Ctr.*, 692 F.3d 580, 589 (7th Cir. 2012) ("[I]f essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract.") (quoting *Milex Prods., Inc. v. Alra Lab., Inc.*, 603 N.E.2d 1226, 1233 (Ill. App. Ct. 1992)).

**Mr. Kim.** Mr. Kim contends that summary judgment is proper for him because Plaintiff offered two differing versions of the alleged oral agreement between him and Plaintiff (30% of KNCI's shares versus 30% of the $500,000 purchase price, R. 90 at 12), and Mr. Kim recalls a third version (30% of the net profits of the business, *id.* at 13). According to Mr. Kim, this disconnect reveals that the terms of the parties' agreement were not "definite and certain," and therefore cannot be enforced. Mr. Kim points in particular to Plaintiff's deposition testimony, in which he states that the nature of his breach of contract claim is:

> that the 30 percent share that I was initially promised, 30 percent share of the company, was not given to me; and by 30 percent I mean 30

18

percent of the $500,000 which was the initial purchase price of the company.

R. 98, Ex. A at 59; s*ee also id.* at 87-88 (stating that Plaintiff had an "ownership right of 30 percent," and that "the way [he] understood [sic] was 30 percent of $500,000 in cash"). In response, Plaintiff explained that he misinterpreted the deposition questions, and that he always understood the agreement to be that he would be made a 30% shareholder. He offers his own declaration, shareholder meeting minutes, and certain tax documents Mr. Kim admitted to signing in support. But none of those documents were filed with a formal response to Mr. Kim's Local Rule 56.1 statement of material facts as required by Local Rule 56.1(b)(3).

Nevertheless, a reasonable juror could conclude from Plaintiff's deposition testimony alone—properly submitted by Mr. Kim with his Local Rule 56.1 statement of facts—that Mr. Kim promised Plaintiff 30% of KNCI's shares, and that any testimony suggesting otherwise was due to Plaintiff's confusion and the language barrier.[7] Indeed, although some excerpts from Plaintiff's testimony suggest that Plaintiff understood that he would receive a portion of the amount of the Newspaper's purchase price after the sale, other excerpts suggest that Plaintiff believed that he was promised 30% of KNCI's shares, but that he would settle his breach of contract claim for 30% of the purchase price. *See, e.g.*, R. 82, Ex. A at 89 (Plaintiff's deposition testimony that "at this point it doesn't mean anything for me to ask for [sic] ownership share of 30 percent of the company. So as a form of restitution I would like to ask at

---

[7] Plaintiff used the services of an interpreter throughout his deposition.

least 30 percent in cash"); *see also id.* at 91 (additional deposition testimony that "[t]he promise was that I have 30 percent right to Korea Times," and that "[b]y rights I am [sic] the rights to the operation and the ownership of the company; and because that right has not been honored for me and that I was fired, I'm saying my right is at least 30 percent of the purchase price of $500,000 at this point.").

Further, in offering his "own version" of the parties' agreement, Mr. Kim necessarily acknowledges that there was some promise to compensate Plaintiff beyond his salary, creating a genuine issue of fact regarding the nature of the terms of that agreement. Mr. Kim offers no other argument in support of his motion. Accordingly, it is denied as to the breach of contract claim against him.

***Andrew Huh and Mrs. Kim.*** Huh and Mrs. Kim also seek summary judgment on Plaintiff's breach of contract claims, arguing that the evidence demonstrates that Plaintiff had no contact with either of them before the consummation of the sale, and therefore could not have promised him any share or other compensation for his work as part of that sale. R. 84 at 11 and R. 87 at 11. Huh and Mrs. Kim each point to their own affidavits, as well as Plaintiff's deposition testimony and responses to their requests to admit, in support.[8] *See* R. 83 ¶¶ 5, 7; R. 86 ¶¶ 5-6, 8. For his part, Plaintiff repeats verbatim the arguments he made regarding Mr. Kim in response to Mr. Kim's motion. But because Plaintiff offers no evidence of any agreement between him and either Huh or Mrs. Kim regarding any alleged promise that he become a shareholder

---

[8] Huh also points to Plaintiff's answer to one of Huh's interrogatories, in which Plaintiff stated that "Defendant Huh was not the one who personally offered him for [sic] shares." R. 86 ¶ 10 (citing R. 86, Ex. D ¶ 11).

(and nor does he otherwise link the promises he contends Mr. Kim made to Huh or Mrs. Kim), the Court grants both Huh's and Mrs. Kim's motions.

## Conclusion

For the reasons stated, Mrs. Kim's motion, R. 82, is granted, and each of Huh's, Mr. Kim's and KNCI's motions are granted in part and denied in part, R. 85; R. 88; R. 91. Plaintiff's cross-motion is also granted in part and denied in part. R. 99. Only Plaintiff's breach of contract claim against KNCI and Mr. Kim, and Plaintiff's FLSA and IMWL claims for his final week of employment against KNCI, Mr. Kim and Huh remain.

ENTERED:

_Thomas M Durkin_

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: January 29, 2020